OPINION *Page 2 
{¶ 1} Appellant-Juvenile, Antonio Wallace appeals from the trial court's decision finding him delinquent for having committed aggravated robbery with a firearm specification.
 STATEMENTS OF FACTS AND CASE {¶ 2} On February 14, 2007, a complaint was filed charging appellant, Antonio Wallace, a juvenile, whose date of birth is December 2, 1991, with being delinquent for having committed one count of aggravated robbery with a firearm specification in violation of R.C. 2911.01 and2941.145, a felony of the first degree, and one count of resisting arrest in violation of R.C. 2921.33, a second degree misdemeanor. An arrest warrant was issued for appellant.[1]
 {¶ 3} On February 16, 2007, appellant was arrested on the existing warrant and a detention hearing was held.
 {¶ 4} On February 18, 2007, the State filed a Notice of Intent to Seek a Serious Youthful Offender Sentence pursuant to R.C. 2152.13. In support, the State argued that appellant was fourteen years of age at the time of committing the offense of aggravated robbery with a firearm, a first degree felony offense.
 {¶ 5} On May 7, 2007, the matter proceeded to adjudication. During the adjudication the State presented the testimony of several witnesses including Peggy Sigler, Carla McKinney, Officer Shaffer, Sergeant Gabbard, Officer Clary, Michael Short and Officer Heslop. Appellant presented the testimony of Frank Owens and testified on his own behalf. *Page 3 
 {¶ 6} During the adjudication, Peggy Sigler testified that in the early morning hours of October 4, 2006, she was walking to her car in the parking lot of the American Legion on Cleveland Avenue N.W., in Canton, Ohio. She testified that the parking lot is well lit at night. She testified that as she walked to the car she unlocked the doors with the remote control. She stated that as she stepped off the sidewalk she saw a person with a dark colored bandana over his mouth, nose and bottom half of his face. She stated that after she saw the person she hurried to her car. She stated that she got into the car and almost had the door shut when the man grabbed the side of the door, pulled the door open, stuck a small silver or shiny handgun in her face and said "I want your purse, bitch". T.21, 30. She testified that she grabbed her purse and pushed it toward the man. The man then grabbed the purse and ran off. She testified that she was very scared and upset. T.42. She testified that she walked back to the building and met Carla McKinney. She stated that Ms. McKinney told her that she saw what happened.
 {¶ 7} Ms. Sigler also testified that her purse contained a paycheck, credit cards, personal items and a cell phone. She testified that, after the phone was taken, approximately 112 unauthorized calls were made on the phone. She identified a cell phone bill from Sprint which included the unfamiliar telephone number "936-2451" and stated that the call had been recorded after the phone had been taken.
 {¶ 8} Finally, Ms. Sigler testified that on October 6, 2006, pursuant to a request by Sergeant Gabbard, she took her car to the police department for fingerprinting. She testified that the man who took her purse had very distinctive eyes, small hands and was small in stature, being approximately 5'6" to 57" in height. Finally, she identified appellant, in the courtroom, as the man who committed the offense.T.22. *Page 4 
 {¶ 9} Carla McKinney testified that she lives in the neighborhood where the American Legion is located. She testified that at approximately 12:15 A.M. on October 4, 2006, she saw a black male wearing jeans and a blue jacket running from the American Legion parking lot, up Shorb Avenue and into a nearby empty lot. She stated that at approximately the same time, she heard a woman crying and knocking on the door of the American Legion building and went to investigate.
 {¶ 10} Officer Shaffer testified that he was on duty with the Canton Police Department on October 4, 2006. He testified that he responded to a robbery call at the American Legion and spoke with Ms. Sigler. He testified that Ms. Sigler's breath had a slight odor of alcohol but that she was not intoxicated. He testified that the matter was thereafter assigned to the detective bureau.
 {¶ 11} Sergeant Gabbard testified that he works in the detective bureau of the Canton Police Department. He stated that on October 4, 2006, he was assigned to investigate the aggravated robbery which occurred at the American Legion in the early morning hours. He testified that he was informed that water condensation on the vehicle had prevented the identification bureau from performing a fingerprint analysis on Ms. Sigler's vehicle at the time of the incident. He stated that he contacted Ms. Sigler to bring the vehicle in for further processing. He testified that as a result of the processing, latent fingerprints were taken from the top inside door frame of the driver's side door of the vehicle.
 {¶ 12} Sergeant Gabbard testified that he also reviewed Ms. Sigler's cell phone records. He stated that her phone records indicated five or six calls to the same number, which was "936-2451". He discovered that the phone number was for *Page 5 
Savannah Cherry. He testified that further investigation revealed that the cell phone had been used by Ms. Cherry's grandson Chauncey Turner. He testified that he asked Mr. Turner to come down to the police department for questioning. After the interview the officer stated that he developed three possible suspects, Chauncey Turner, Antonio Wallace and Brandon Everrett.
 {¶ 13} Sergeant Gabbard testified that he then got descriptions of the suspects. He stated that Brandon Everett was 6' tall weighing over 200 pounds. He stated that Chauncey Turner fit the description of the perpetrator but, upon further examination, his fingerprints did not match the latent fingerprints taken from the victim's vehicle. He testified that as a result Antonio Wallace became the prime suspect.
 {¶ 14} Sergeant Gabbard testified that on February 2, 2007, he and Detective Clary went to the appellant's home. At the home he met the appellant, who, in the presence of his mother, agreed to give the officers his fingerprints. However, because the fingerprints were slightly smudged, the officer also got a warrant for a second set of fingerprints from appellant. He testified that the fingerprints were submitted to the crime lab for comparison with the latent fingerprints that had been taken from the victim's car door.
 {¶ 15} Sergeant Gabbard also testified that he spoke with the appellant while he was obtaining his fingerprints. He stated that the appellant said that he did not know who was involved in the aggravated robbery but that he had heard, "through the neighborhood that someone named Bama might be involved." T. 167-168.
 {¶ 16} Michael Short testified that he works for the Canton Stark County Crime Lab. He stated that he specializes in firearm and fingerprint evidence. He testified that *Page 6 
he compared the latent fingerprints taken from Ms. Sigler's vehicle with the fingerprints on appellant's fingerprint card. He testified that the results showed a match for appellant's left middle finger and left ring finger with the latent fingerprints collected from Ms. Sigler's vehicle.
 {¶ 17} Officer Heslop testified that he is a canine handler for the Canton Police Department. He testified that he and two other officers went to appellant's home to execute a warrant for his arrest. He testified that he went to the rear of the residence and observed the appellant running from the home. He stated that he gave the canine warning, the appellant refused to stop, and he then deployed the dog to apprehend the appellant.
 {¶ 18} Appellant testified on his own behalf. During his testimony appellant stated on the night of the incident he was with Curtis Williams whose nickname is "Bama". He stated that earlier in the evening he and Williams had been checking out cars and opening doors to see if there was anything worth stealing inside. He stated that he pulled on the victim's car door and "it opened". He stated that he used his elbow to close the door and left. He stated that later he was with Williams walking through the American Legion parking lot. He stated that Williams showed him a gun and said, "Is you ready". He stated that he said "Naw" and Williams started running and he kept walking. T.150. He stated that he turned and saw him [Williams] "Doin it". T.150. He stated, "The gun he had was real." T.153. Appellant admitted that he was at the scene of the aggravated robbery. T.154.[2] He further admitted that when the police officers came to his house to serve the arrest warrant he fled. *Page 7 
 {¶ 19} On redirect Sergeant Gabbard testified that he did not investigate a person named Curtis Williams or Bama for two reasons, "Number one, we had a positive identification on the fingerprints found inside the vehicle; and number two, Peggy Sigler never said that there were two people involved. We also had the witness, Carla McKinney, who was an eye witness to the person running away and never saw another person in the area." T.161.
 {¶ 20} On redirect Ms. Sigler was shown a photo of Curtis Williams and stated that she did not recognize the man in the photo. T.171 She further testified that her car was locked on the evening of the aggravated robbery. T.170.
 {¶ 21} On May 7, 2007, after the presentation of the evidence, the trial court found appellant delinquent on both counts in the complaint. T.184. The trial court also found, that pursuant to State v.Murphy, 49 Ohio St.3d 206, the weapon used in the offense as set forth in the specification was an operable firearm. T.184. The trial court then proceeded to disposition. During disposition the trial court stated, "I'm not buying the story about looking through the cars." T.187. The trial court further ordered that appellant be committed to the Department of Youth Services for a one year term of detention for the charge of aggravated robbery and a three year term of detention for the firearm specification. The trial court further ordered that the commitments for aggravated robbery and the firearm specification were to be served consecutively.
 {¶ 22} It is from this adjudication and disposition that appellant now seeks to appeal setting forth the following assignments of error: *Page 8 
 {¶ 23} "I. THE ADJUDICATION OF APPELLANT AS DELINQUENT BY AGGRAVATED ROBBERY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 24} "II. THE TRIAL COURT ERRED AND/OR ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO THREE YEARS ON THE GUN SPECIFICATION.
 {¶ 25} "III. THE TRIAL COURT ERRED IN FINDING THAT THE STATE HAD PROVEN THE ELEMENTS OF THE FIREARM SPECIFICATION BEYOND A REASONABLE DOUBT THROUGH ONLY THE TESTIMONY OF THE VICTIM.
 I, III {¶ 26} In the first and third assignments of error appellant argues that the trial court's delinquency finding of aggravated robbery with a gun specification is against the manifest weight and sufficiency of the evidence. Essentially appellant concedes that an aggravated robbery occurred but denies being the perpetrator. Appellant also argues that the victim's testimony alone is insufficient to uphold a conviction on the gun specification. We disagree.
 {¶ 27} A trial court may enter a finding of delinquency when the evidence demonstrates, beyond a reasonable doubt, that the child committed an act that would constitute a crime if committed by an adult. R.C. 2151.35(A); Juv.R. 29(E)(4). Thus, when reviewing the sufficiency of the evidence in a juvenile context, we apply the same standard of review applicable to criminal convictions. See In re Watson (1989),47 Ohio St.3d 86, 91, 548 N.E.2d 210. Our function when reviewing the sufficiency of the evidence is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond *Page 9 
a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id., citing Jackson v.Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 28} The legal concepts of sufficiency and weight of the evidence are different. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541, paragraph two of the syllabus. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenges whether the State has met its burden of persuasion." State v Thompkins, supra at 390, see also, State v. Blausey, Licking App. No. 2006-CA-36,2006-Ohio-5536. Thus, even if we conclude that a conviction is supported by sufficient evidence, we must still address the weight of the evidence, for it is possible that the evidence may be legally sufficient to go to the jury, yet be so logically unpersuasive that it cannot support a conviction. See State v. Robinson (1955), 162 Ohio St. 486,487, 124 N.E.2d 148.
 {¶ 29} Our function when reviewing the weight of the evidence is to determine whether the greater amount of the credible evidence supports the verdict. Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541. In order to undertake this review, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. Id., citing State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. If we find that the fact finder clearly lost its way, we must reverse the conviction and order a new trial. Id. On the other hand, we will not reverse a *Page 10 
conviction so long as the state presented substantial evidence for a reasonable trier of fact to conclude that all of the essential elements of the offense were established beyond a reasonable doubt. State v.Getsy, 84 Ohio St.3d 180, 193-94, 1998-Ohio-533, 702 N.E.2d 866. In conducting our review, we are guided by the presumption that the trier of fact "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 30} Moreover, "[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." State v. Sevilla, Franklin App. No. 06AP-954,2007-Ohio-2789, at paragraph 13, citing State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at paragraph 21. "The trier of fact is free to believe or disbelieve all or any of the testimony. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. Consequently, although an appellate court must act as a `thirteenth juror' when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility."Id. (Internal citations omitted).
 {¶ 31} In this case appellant was charged with aggravated robbery with a firearm specification and resisting arrest. Appellant only challenges the trial court's aggravated robbery and firearm specification delinquency findings.
 {¶ 32} A delinquency finding for aggravated robbery pursuant to R.C.2911.01(A)(1) requires the State to prove beyond a reasonable doubt that the offender *Page 11 
in attempting to commit a theft offense, as defined in section 2913.02
of the Revised Code, or in fleeing immediately after the attempt or offense, did have, a deadly weapon on or about the offender's person or under the offender's control and either displayed the weapon, brandished it, indicated that the offender possessed it, or used it. A deadly weapon is defined as any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed carried or used as a weapon. R.C. 2923.11.
 {¶ 33} A firearm specification in violation of R.C.2929.14(D) and 2941.145 requires a finding that "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.
 {¶ 34} In order to enhance the underlying aggravated robbery with a firearm specification, the State must present evidence beyond a reasonable doubt that the firearm was operable at the time of the offense. State v. Murphy (1990), 49 Ohio St.3d 206, 551 N.E.2d 932.State v. Gaines (1989), 46 Ohio St.3d 65, 545 N.E.2d 68.
 {¶ 35} "[A] firearm penalty-enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm."State v. Thompkins (1997), 78 Ohio St.3d 380, 385, 678 N.E.2d 541. Thus, where an individual brandishes a gun and *Page 12 
implicitly, but not expressly threatens to discharge the firearm at the time of the offense, the threat can be sufficient to satisfy the state's burden of proving that the firearm was operable or capable of being readily rendered operable. Id at 384. "Thompkins clarifies that actions alone, without verbal threats, may be sufficient circumstances to establish operability of a firearm." State v. Reynolds (1997),79 Ohio St. 3d 158, 679 N.E.2d 1131 (noting circumstantial evidence of two masked men waiving guns stating that they are committing a robbery was sufficient to sustain a firearm specification). See also State v.Knight, Greene App. No. 2003 CA 14, 2004-Ohio-1941, at paragraph 19 ("both a weapon's existence and its operability may be inferred from the facts and circumstances").
 {¶ 36} Furthermore, a victim's belief that the weapon is a gun, together with the defendant's intent to create and use the victim's belief for the defendant's own criminal purposes, is sufficient to prove a firearm specification. See State v. Jeffers (2001),143 Ohio App.3d 91, 757 N.E.2d 417 (sufficient evidence existed to support firearm specification when robbery defendant kept hand in pocket and told convenience store that he would "blow [her] head off" if she did not comply); State v. Obsaint, Hamilton App. No. C-60629, 2007-Ohio-2661, (defendant's written admission that he had a gun, in a note that made repeated references to shooting the teller, was sufficient circumstantial evidence to show that he possessed an operable firearm);State v. Greathouse, Montgomery App. No. 21536, 2007-Ohio-2136
(sufficient evidence supported firearm specification even though the victim never saw the gun when the defendant told the victim that he had a gun and that he would kill her and dump her body if she did not comply). *Page 13 
 {¶ 37} In this case, the victim testified that she locked her car on the evening of October 3, 2006. She testified that in the early morning hours of October 4, 2006, as she was walking to her car, she noticed a black male in the parking lot with a bandana over the bottom half of his face. She testified that she thought something was up, used her remote button to unlock the door to her vehicle and hurried to get into the driver's side door. She stated that as she was getting into the car the man ran toward her, grabbed the top half of the car's door frame and struggled with her as she tried to get the door closed. She stated that he finally pulled the door open, stuck a silver handgun in her face and said, "I want your purse, bitch." She stated that after she saw the gun, she pushed her purse toward the appellant. She stated that the appellant then grabbed her purse and fled. She testified that her purse contained, among other things, money, checks, credit cards and a cell phone. She testified that she was very scared and upset.
 {¶ 38} Michael Short from the crime lab testified that the latent fingerprints collected from the inside of the victim's driver side car door were a match for the fingerprints taken from appellant's left hand. Furthermore, appellant admitted to being at the scene of the incident with another black male named Curtis Williams, nicknamed "Bama", who, appellant claimed, committed the aggravated robbery offense. Officer Gabbard testified that it was unlikely that there were any other viable suspects, such as Curtis Williams, since the witnesses only saw a single black male in the parking lot at the time of the offense. In addition, the testimony of the appellant, that he and Williams had been opening car doors earlier to see if anything worth stealing was inside and that Williams was the sole perpetrator of the aggravated robbery, was contradictory to the evidence that the victim's car was locked and that appellant's fingerprints were found on *Page 14 
the inside of the door of the vehicle where the victim stated the struggle to close the door occurred. Furthermore, the victim identified appellant as being the perpetrator, stating that he had distinctive eyes and a small stature. She also testified that she did not recognize the photograph of Curtis Williams.
 {¶ 39} Based upon the evidence presented we find that the trial court's finding that appellant was delinquency by reason of having committed aggravated robbery was not against the manifest weight or sufficiency of the evidence.
 {¶ 40} We further find that the operability of the firearm could be inferred from the appellant's actions of sticking a gun in the victim's face and demanding her purse. Therefore, the trial court's finding of delinquency for the firearm specification enhancement was not against the manifest weight or sufficiency of the evidence.
 {¶ 41} Accordingly, appellant's first and third assignments of error are hereby overruled.
 II {¶ 42} In the second assignment of error appellant argues that the trial court abused its discretion in sentencing appellant to serve a three year mandatory sentence in the Department of Youth Services for the firearm specification. Specifically, appellant argues that the trial court ignored the overriding principles and purposes of imposing juvenile dispositions. Appellant further argues that the trial court should have exercised its discretion to impose graduated sanctions and should have committed appellant, at a maximum, to a one year term of detention for the firearm specification. We disagree.
 {¶ 43} Juvenile courts have broad discretion to craft dispositions for delinquent children. In re D.S., 111 Ohio St.3d 361, 363,2006-Ohio-5851, 856 N.E.2d 921. *Page 15 
Generally, courts of review will not disturb a trial court's choice of disposition absent an abuse of discretion. Id. When reviewing for an abuse of discretion, appellate courts must not substitute their judgment for that of the trial court. State ex rel. Duncan v. Chippewa Twp.Trustees (1995), 73 Ohio St.3d 728, 732, 654 N.E.2d 1254; In re Jane Doe1 (1991). 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181.
 {¶ 44} Ohio law requires juvenile courts to make dispositions that are reasonably calculated to achieve the purposes set forth by statute for the disposition of juvenile delinquents. See R.C. 2152.01.[3] Those purposes include, inter alia, the care and protection of children, the protection of the public interest, holding the delinquent accountable for his actions, restoring the victim and rehabilitating the offender. Despite the stated purposes of providing for the care, protection, and development of children, and to rehabilitate the offender, some circumstances justify substantial confinement in order to fulfill the purposes of protecting public safety and holding the offender accountable. See In re J.B., Butler App. No. CA2004-09-226,2005-Ohio-7029, at paragraph 120. Therefore, if a sentence is within the appropriate statutory limit, reviewing courts presume that the trial court followed the applicable guidelines. State v. Wagner (1992),80 Ohio App.3d 88, 95-96, 608 N.E.2d 852. *Page 16 
 {¶ 45} R.C. 2941.145 specifically authorizes a definite term of confinement for an offender who, "had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."
 {¶ 46} Juvenile court provision R.C. § 2152.17(A), entitled felony specifications, states in pertinent part as follows:
 {¶ 47} "* * * if a child is adjudicated a delinquent child for committing an act, other than a violation of section 2923.12 of the Revised Code, that would be a felony if committed by an adult and if the court determines that, if the child was an adult, the child would be guilty of a specification of the type set forth in section 2941.141,2941.144, 2941.145, 2941.146, 2941.1412, 2941.1413, or 2941.1414 of the Revised Code, in addition to any commitment or other disposition the court imposes for the underlying delinquent act, all of the following apply:
 {¶ 48} * * * "(2) If the court determines that the child would be guilty of a specification of the type set forth in section 2941.145 of the Revised Code * * *, the court shall commit the child to the department of youth services for the specification for a definite period of not less than one and not more than three years, and the court also shall commit the child to the department for the underlying delinquent act under sections 2152.11 to 2152.16 of the Revised Code."
 {¶ 49} Thus, a juvenile who commits a crime that, if committed by an adult, would amount to a firearm specification in violation of R.C.2941.145, he can be sentenced for a definite term of one to three years of incarceration. *Page 17 
 {¶ 50} In this case, at the disposition, appellant's prior delinquency history was presented as follows: On May 12, 2004, appellant was found delinquent of having committed two counts of felony burglary and ordered to serve two six month commitments to the Department of Youth Services. The burglary commitments were suspended on the condition that appellant be placed on probation. On January 31, 2005, appellant was released from probation. On August 3, 2005, appellant was found delinquent of receiving stolen property and was placed back on probation.
 {¶ 51} The victim's written statement was also presented at disposition. In the statement the victim related that at the time of the incident she truly believed that the appellant was going to shoot her. She stated that she is fearful and no longer feels comfortable leaving work after dark.
 {¶ 52} On his own behalf appellant denied committing the offense. Appellant's father also stated that he didn't believe that his son had committed the offense.
 {¶ 53} Upon hearing appellant's prior history, the victim impact statement, appellant's father's statement and the statements of counsel, the juvenile court sentenced appellant to serve a three year term of detention for the gun specification in the Department of Youth Services. The trial court further stated, "If you are doing well there, I won't rule out the possibility of early release but you are going to have to be showing me a lot. You're going to have to get your education, you're going to have to be somebody that doesn't have any write-ups, you're going to have to do your absolute best there. Cause this business of people running around with guns and shooting them in the community, you know, there are people dying out there on our streets and it's *Page 18 
because people are running around with guns and I'm just not going to put up with it." T.189.
 {¶ 54} Upon a review of the record we do not find that the juvenile court abused its discretion in ordering appellant to serve a three term of commitment in the Department of Youth Services for the firearm specification. In the prior felony disposition, the juvenile court attempted to rehabilitate the appellant by placing him on probation. Those measures did not prevent appellant from re-offending and committing the first degree felony offense of aggravated robbery with a firearm. While the court had the discretion to impose a more graduated sanction, we find no abuse of discretion in the disposition imposed. Furthermore, we find that the imposition of the Department of Youth Services Commitment with early release consideration is commensurate with the delinquency finding.
 {¶ 55} Accordingly appellant's second assignment of error is not well taken and is hereby overruled. *Page 19 
 {¶ 56} The judgment of the Stark County Court of Common Pleas, Juvenile Division, is hereby affirmed.
 Edwards, J. Gwin, P.J. and Wise, J. concur *Page 20 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.
[1] The appellant only seeks to appeal from the conviction and disposition for aggravated robbery with a firearm specification.
[2] State: So you'll agree with me that you were at the scene of the Aggravated Robbery? Appellant: Yes. Transcript of Proceedings at page 154.
[3] 2152.01 Purposes; applicability of law
(A) The overriding purposes for dispositions under this chapter are to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender. These purposes shall be achieved by a system of graduated sanctions and services.
(B) Dispositions under this chapter shall be reasonably calculated to achieve the overriding purposes set forth in this section, commensurate with and not demeaning to the seriousness of the delinquent child's or the juvenile traffic offender's conduct and its impact on the victim, and consistent with dispositions for similar acts committed by similar delinquent children and juvenile traffic offenders. The court shall not base the disposition on the race, ethnic background, gender, or religion of the delinquent child or juvenile traffic offender. *Page 1